# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>vs.<br><br>JUNIAN M. JOHNSON,<br><br>                  Defendant. | 8:22CR270<br><br>**FINDINGS AND RECOMMENDATION** |

This matter is before the Court on the Motion to Suppress (Filing No. 23) filed by Defendant, Junian M. Johnson. Defendant filed a brief (Filing No. 23-1) in support of his motion and the government filed a brief (Filing No. 28) in opposition. Defendant moves to suppress evidence obtained from his vehicle pursuant to a search warrant, arguing the warrant was procured as a result of his unlawful detention in violation of the Fourth Amendment. Defendant also contends the warrant was so lacking in probable cause and contained material omissions or false statements with reckless disregard for the truth such that the *Leon* good faith exception does not apply; Defendant requests a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978) for the same reason.

The Court held a pre-hearing status conference with counsel on April 5, 2023, and held an evidentiary hearing on the motion on May 9, 17, and 24, 2023. Defendant was present at the evidentiary hearing proceedings with his attorneys, Keith W. Dornan and Stuart J. Dornan. The government was represented by Assistant United States Attorney, Matt E. Lierman. Testifying at the hearing were: Omaha Police Department (OPD) Officer Tanner Reiss (Officer Reiss); OPD Detective Tarrence Vernon (Detective Vernon); OPD Officer Mitchell Hetherington (Officer Hetherington); OPD Officer Bryson Blandford (Officer Blandford); Bridget Smith; Phyllis Brooks; OPD Officer August Hogan III (Officer Hogan); and OPD Sergeant Zachary Petrick (Sergeant Petrick). The Court received into evidence, without objection, the government's exhibits:

    Exhibit No. 1 - Search warrant application and affidavit
    Exhibit No. 2 - 911 audio recording
    Exhibit No. 3 - Body Worn Camera (BWC) footage from Detective Vernon
    Exhibit No. 4 - BWC footage from Officer Reiss
    Exhibit No. 5 - BWC footage from Officer Hogan

The Court also received into evidence, without objection, Defendant's exhibits:

>Exhibit No. 101 - Dispatch incident report
>Exhibit No. 102 - Audio recording of dispatch communication to officers
>Exhibit No. 103 - OPD arrest report
>Exhibit No. 104 - Warrantless arrest affidavit
>Exhibit No. 105 - Dashcam of Officers Reiss and Hogan;
>Exhibit No. 106 - BWC from Officer Hetherington
>Exhibit No. 107 - BWC recording from Officer Blandford
>Exhibit No. 108 - BWC recording from Officer Greene
>Exhibit No. 109 - BWC recording from Sergeant Petrick at Bristol
>Exhibit No. 110 - BWC recording from Sergeant Petrick at tow lot
>Exhibit No. 111 - BWC recording from Detective Vernon at tow lot
>Exhibit No. 112 - Screenshot of Officer Reiss BWC
>Exhibit No. 113 - OPD Supplemental Report

A transcript (TR.) of the hearing was prepared and filed on June 23, 2023. ([Filing No. 70](#)). At the hearing, the Court granted Defendant's request to file written closing arguments 14-days after the transcript was filed. Defendant filed his closing arguments ([Filing No. 71](#)) on July 7, 2023, and the matter is now fully submitted to the Court. For the following reasons, the undersigned magistrate judge recommends that Defendant's motion be denied.

## BACKGROUND

On November 13, 2022, at approximately 7:45 p.m., a female caller to 911 reported that she "just" saw someone shooting out of a window of a black Tahoe near North 24th Street and Bristol Street, and provided a partial license plate number for the vehicle, "YAK91." The female caller provided her first name, and dispatch confirmed her telephone number. (Ex. 2; TR. 215). Dispatch relayed the information provided by the 911 caller over the radio to OPD officers.

Officer Reiss and his partner, Officer Hogan, were on patrol at least a quarter mile away in the area of 30th Street and Lake Street when they received the call from dispatch. Both officers testified they did not personally hear any shots fired. (TR. 18, 20-21, 215-216). Officers Blandford and Hetherington were responding to an unrelated incident at 24th Street and Lathrop, which was approximately 20-feet away from where the 911 caller said the shots came from, when they received the shots fired dispatch report. Officers Blandford and Hetherington testified they did not hear any shots or see a black Tahoe, so they gave dispatch a "Code 5," meaning they did not see or locate anything. (TR. 55, 147, 177-178, 184-185). Detective Vernon and Sergeant Petrick received the

shots fired call near 30th Street between Lake and Ames Streets, and both also testified they did not hear any shots. Responding officers also did not receive a ShotSpotter activation.[1] Sergeant Petrick testified it would be "unusual" for ShotSpotter not to detect gunfire, although it does happen "from time to time." (TR. 256-237). Despite not personally hearing gunfire, the officers testified that they were still required to reasonably investigate the report and respond to the 911 call. (TR. 76, 106-107, 137, 139, 147).

Detective Vernon ran the partial license plate number provided by the 911 caller through the mobile data computer in his cruiser, and found a black 2011 Chevrolet Tahoe with a Nebraska license plate number "YAK915" was registered to Junian Johnson, a black male, at 2503 Bristol Street, Omaha, Nebraska, which was one block from where the caller had reported the shots were fired. Dispatch relayed this information to responding officers. (TR. 112-113, 140, 256-237). Officers Reiss and Hogan arrived in the area of 2503 Bristol Street at approximately 7:51 p.m., within a couple minutes after receiving the call from dispatch. As they arrived, Officer Reiss and Officer Hogan saw a black Tahoe with a Nebraska license plate number YAK915 backing into an unfenced common driveway shared between multiple townhomes. (TR. 21-24, 32, 227). Officer Reiss and Officer Hogan pulled their patrol vehicle partially into the shared driveway approximately 10 to 12 feet away from the Tahoe with their flood light or "takedown" light on, but not their red and blue overhead lights or sirens. Officers Reiss and Hogan exited their vehicle and saw the black male driver of the Tahoe, later identified as Defendant, get out of the Tahoe and open its rear driver's side door. (TR. 26-27, 68, 227-228).

Officers Reiss and Hogan observed Defendant "messing around" in the floorboard area of the rear driver's side of the Tahoe. Officer Hogan testified Defendant was making "furtive gestures" behind the driver's side, but could not see Defendant's hands to know what he was doing, holding, or retrieving. Officer Reiss called out to Defendant, "Can I speak to you?" but Defendant did not respond and acted as if he did not hear Officer Reiss. Officer Hogan had unholstered his service weapon but was not displaying it. Officer Reiss shined his flashlight at the Tahoe's window to try to see what Defendant was doing and to get Defendant to acknowledge the officers. Officer Reiss called out to Defendant again, while Officer Hogan approached around the back of the Tahoe to make contact with Defendant. Defendant then locked the Tahoe, placed the keys inside, and shut

---

[1] ShotSpotter devices placed around the city activate when they detect gunshots, and pinpoint the location the gunshots came from. (TR. 39-40).

3

the door with the Tahoe's keys locked inside. Officer Reiss testified he was concerned for officer safety and asked Defendant if he could check him for weapons. Defendant replied, "No," but Officer Reiss nevertheless conducted a pat-down of Defendant to check for weapons, finding none. (TR. 27-30, 228; Ex. 4 at 0:50-1:09). Officer Reiss asked Defendant where he was coming from, and Defendant replied he was "just in traffic." Officer Reiss asked Defendant if anything happened in traffic and asked if Defendant knew why they were there. Defendant indicated nothing happened and stated he thought his girlfriend "did this" because she was mad at him, and proceeded to call a woman on his cell phone.

Sergeant Petrick and Detective Vernon arrived shortly after Officers Reiss and Hogan. Detective Vernon walked up behind Defendant and performed a second pat-down of Defendant. Defendant denied having weapons and denied officers' requests to let them search his vehicle. Defendant said he was there visiting a friend and indicated he lived in the building on the other side of the driveway. (TR. 31, 75, 77, 147; Ex. 4 at 1:09-2:50). Detective Vernon handcuffed Defendant approximately two minutes after law enforcement first contacted Defendant, citing safety reasons due to the nature of the shots fired 911 call in a high crime area. (TR. 116-117).

While Detective Vernon was attending to Defendant, Officer Hogan walked around the Tahoe looking through its windows from the outside. Officer Reiss took Defendant's driver's license, and also walked around the Tahoe looking into its windows with his flashlight. Officer Reiss returned to his cruiser to conduct a data check, and learned Defendant was on "U.S. probation." (TR. 32, 78, 80). Sergeant Petrick also contacted dispatch from his own cruiser, and learned Defendant was on federal probation and had a prior Nebraska charge of being a prohibited person in possession of a firearm. Sergeant Petrick testified he therefore "assumed" Defendant was a felon, but did not have access to Defendant's non-Nebraska criminal history to see the original conviction at that time. The fact that Defendant was on federal probation indicated to officers Defendant had been convicted of "some sort of a felony" or federal offense. (TR. 123, 150, 157, 169-170, 238).

Officers Blandford and Hetherington proceeded to the area of 2503 Bristol Street when they finished responding to their unrelated incident to see if their assistance was needed, arriving around 7:57 p.m. When they arrived, Officers Blandford and Hetherington advised the officers on the scene that they had not heard any gunfire. (TR. 180, 185-186). Officer Blandford approached Officer

4

Reiss while he was in his cruiser running the data check, and expressed his opinion that someone may have made the 911 call knowing Defendant had a gun. (TR. 190-191; Ex. 4 at 7:07-7:15).

While Officer Reiss was in his cruiser running the data check on Defendant, Detective Vernon walked around the Tahoe, and, using his flashlight, looked into the Tahoe's windows from the outside starting with the driver's side front window. When he looked into the window of the driver's side rear door from the outside of the vehicle, he saw approximately two inches of a magazine protruding from underneath the driver's seat. (TR. 33-34, 88, 117-118). At approximately 7:58 p.m., while looking into the Tahoe's window from the outside, Detective Vernon stated to himself, "There's a gun right there," and then called out to Defendant, "It looks like you've got a gun in there," and "it looks like a magazine." (Ex. 3 at 1:54-2:04). In Detective Vernon's years of experience, he is knowledgeable about firearms and firearm magazines, and he testified he immediately recognized the object as a firearm magazine. (TR. 120). Once he observed the magazine, Detective Vernon asked officers to place Defendant in the back of a police car. (TR. 120; Ex. 3 at 2:08-2:12).

The officers discussed their next steps, and determined they would search the vehicle because the magazine was a concealed weapon they saw in plain view. Detective Vernon attempted to open the Tahoe, but it was locked. Officers realized Defendant had locked the keys inside the Tahoe. After further discussion, Sergeant Petrick decided to tow the Tahoe to an impound lot and obtain a search warrant because it was locked on private property. (TR. 120-121; Ex. 5 at 8:25-12:00; Ex. 109 at 11:29-15:22).

Officer Reiss arrested Defendant and transported him to central headquarters, while other officers remained on scene to transport the Tahoe to an impound lot pending procurement of a search warrant. (TR. 34-35). Detective Vernon authored an affidavit and application for a search warrant containing the following information:

> On SUNDAY 13 NOVEMBER 2022 at approx. 1946 hours UPB Officers Tanner REISS #2523 and August HOGAN #2263 were dispatched to the area of 2500 Bristol regarding a shot fired call. Dispatch reported the caller saw a "black Tahoe shooting off rounds ... possibly Just went west on N 24th … Plate YAK91?"
>
> Your affiant completed a data check on possible license plates starting with YAK91. Your affiant found a possible matching license plate YAK915 belonging to a Black 2011 Chevrolet Tahoe K1500 registered to Junian Marsa'illes JOHNSON at 2503 Bristol Street, Omaha Ne. 68111. Your affiant notified responding officers of the possible address via police radio.

5

>Officers REISS and HOGAN observed the vehicle on Bristol Street backing Into a driveway at 2505 Bristol Street. Officers REISS and HOGAN both reported observing the vehicle initially on Bristol, a city street in Omaha Ne.
>
>Officers REISS and HOGAN informed affiant officer they both approached the vehicle and observed the driver later Identified as Junian M. JOHNSON (b/m 5-3-76) standing outside the rear driver's side door. Officers REISS and HOGAN described JOHNSON "messing around" inside the vehicle behind the driver's seat. Officers then said JOHNSON closed the door.
>
>Your affiant and Sgt. Zackary PETRICK #1655 arrived to assist. Your affiant asked JOHNSON for consent to search his vehicle. JOHNSON denied consent to search and said there were no drugs or weapons in the vehicle. JOHNSON further stated he did not own the vehicle.
>
>Your affiant then used a flashlight and looked inside the vehicle. Your affiant looked in the driver's side back door window. Your affiant observed what appeared to be the bottom one inch of a handgun magazine.
>
>Officer HOGAN #2263 completed a data check on JOHNSON finding he Is a convicted felon as of 06/30/98 for a charge of Felon in Possession of a Firearm out of Illinois as well as 08/10/07 for a Federal Conviction of Felon In Possession of a Weapon.
>
>Vehicle #1- Black Chevy Tahoe NE/ YAK915 was towed to the police impound lot 7809 "F" St. and is currently being held pending this search warrant request.
>
>Your affiant believes that if he is granted this court authorized search warrant he would find evidence related to the shots fired/ Felon In Possession of a Firearm.

(Ex. 1). A Nebraska county court judge signed a search warrant for the Tahoe based upon the above information. In searching the Tahoe at the impound lot pursuant to the warrant, officers located a Glock 29 firearm attached to the magazine that officers had observed protruding from underneath the driver's seat. Officers also recovered pills later identified as fentanyl. (TR. 118, 122).

Defendant is charged in a one-count indictment with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). (Filing No. 1). Defendant has now filed the instant motion to suppress all evidence obtained as a result of his encounter with law enforcement on November 13, 2022. Defendant primarily argues officers did not have reasonable suspicion justifying his investigatory stop and detention, and that therefore all evidence obtained after his detention is fruit of that Fourth Amendment violation. (Filing No. 71 at pp. 4, 15-28). Defendant

6

further asserts that, even if officers did have reasonable suspicion to conduct an investigatory stop, such stop was longer than necessary and not minimally intrusive. (Filing No. 71 at pp. 28-30). Defendant further argues officers were not lawfully on the shared driveway when they observed the magazine inside the Tahoe parked on his curtilage. (Filing No. 71 at pp. 30-35). Defendant also argues his arrest was not supported by probable cause. (Filing No. 71 at p. 25). Finally, Defendant argues the warrant was so lacking in probable cause and contained material omissions or false statements with reckless disregard for the truth such that the *Leon* good faith exception does not apply; Defendant requested a hearing pursuant to *Franks* for the same reason.[2] (Filing No. 71 at pp. 35-36; Filing No. 23-1 at pp. 11-14).

## ANALYSIS

Defendant asserts numerous Fourth Amendment violations occurred from the moment officers first made contact with him in the driveway of 2503 Bristol Street, but ultimately the evidence Defendant seeks to suppress—the Glock 29 firearm recovered from the Tahoe—was obtained pursuant to a search warrant authorized by a Nebraska county court judge.

"If an affidavit in support of a warrant contains information that was obtained in violation of the Fourth Amendment, the reviewing court must redact that information and evaluate whether the remainder establishes probable cause." *United States v. Brooks*, 22 F.4th 773, 778-79 (8th Cir.), *cert. denied*, 142 S. Ct. 2826 (2022) (citing *United States v. Karo*, 468 U.S. 705, 719 (1984) and *United States v. Swope*, 542 F.3d 609, 614 (8th Cir. 2008)). "Probable cause to issue a search warrant exists when an affidavit in support of the warrant sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007) (internal quotation marks omitted) (quoting *United States v. Davis*, 471 F.3d 938, 946 (8th Cir. 2006)).

"In the absence of an allegation that the magistrate abandoned his detached and neutral role, suppression is appropriate only if the officers were dishonest or reckless in preparing their affidavit or could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon*, 468 U.S. 897, 920 (1984). "In the ordinary case, an officer cannot be expected to question the magistrate's probable-cause determination or his judgment that the form of the

---

[2] At the evidentiary hearing on the motion to suppress, the Court denied Defendant's request for a *Franks* hearing because Defendant failed to make a substantial preliminary showing that the warrant affiant knowingly and intentionally made reckless false statements or omissions necessary to the finding of probable cause. (TR. 5, 15-16).

7

warrant is technically sufficient." *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (quoting *Leon*, 468 U.S. at 922 (1984)). Under *Leon*, evidence seized in reliance on a search warrant is not subject to suppression unless:

> (1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702-03 (8th Cir. 2017) (citing *Leon*, 468 U.S. at 923). An issuing judge's determination of probable cause "should be paid great deference by reviewing courts." *United States v. Mutschelknaus*, 592 F.3d 826, 828 (8th Cir. 2010), and the reviewing court's "inquiry is limited to discerning whether the issuing judge had a substantial basis for concluding that probable cause existed." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016) (quoting *United States v. Lucca*, 377 F.3d 927, 933 (8th Cir. 2004)). "As 'a practical and common-sens[e] standard,' probable cause leaves plenty of room to draw reasonable 'inferences' from less-than-perfect evidence." *United States v. James*, 3 F.4th 1102, 1105 (8th Cir. 2021) (alterations in original) (quoting *Cronin v. Peterson*, 982 F.3d 1187, 1197 (8th Cir. 2020)). For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, officers' pre-warrant conduct must have been "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." If "the officers' pre-warrant conduct is 'clearly illegal,' the good-faith exception does not apply." *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). "The 'operative test' is 'whether a reasonably well trained officer would have known that the search was illegal [despite the issuing judge's authorization].'" *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021), *reh'g denied* (May 19, 2021) (quoting *United States v. Koch*, 625 F.3d 470, 477 (8th Cir. 2010)).

Because the evidence in this case was obtained pursuant to a search warrant, the undersigned magistrate judge will begin by reviewing the search warrant affidavit to determine whether it contained any information obtained as a result of Defendant's asserted Fourth Amendment violations, and if so, whether the remainder of the warrant affidavit established probable cause to search the Tahoe with that information redacted. See *Brooks*, 22 F.4th at 778-79.

Detective Vernon authored a search warrant affidavit containing the following information: on November 13, 2023, at approximately 7:46 p.m., Officer Reiss and Officer Hogan were dispatched to the area of 2500 Bristol regarding a shot fired call; dispatch reported the caller saw a "black Tahoe shooting off rounds," it possibly went west on North 24th, and had a license plate YAK91?; Detective Vernon ran a data check on possible license plates starting with YAK91 and found a possible matching license plate YAK915 belonging to a Black 2011 Chevrolet Tahoe K1500 registered to Junian Johnston at 2503 Bristol Street, Omaha NE. 68111, and notified responding officers of the possible address over the radio; from Bristol Street, Officer Reiss and Officer Hogan observed the vehicle backing into a driveway at 2505 Bristol Street; Officer Reiss and Officer Hogan approached the vehicle and observed the driver, later identified as Junian Johnson (Defendant) standing outside the rear driver's side door; Officer Reiss and Officer described Defendant "messing around" inside the vehicle behind the driver's seat before closing the door; Detective Vernon and Sergeant Petrick arrived to assist; Defendant denied consent to search his vehicle and denied having drugs or weapons in the vehicle; Defendant stated he did not own the vehicle; Detective Vernon used a flashlight and looked inside the vehicle, and in looking in the driver's side back door window, Detective Vernon observed what appeared to be the bottom one inch of a handgun magazine; a data check run on Defendant revealed he is a convicted felon as of 6/30/98 for a charge of felon in possession of a firearm in Illinois, and 8/10/07 for a federal conviction of felon in possession of a weapon; the vehicle was towed to a police impound lot and was being held pending a search warrant request to find evidence related to the shots fired call/felon in possession of a firearm. (Ex. 1).

In reviewing the above affidavit, the undersigned magistrate judge finds that it established probable cause to issue the search warrant for the Tahoe, and that none of the information supporting probable cause was obtained in violation of Defendant's Fourth Amendment rights. First, the undersigned magistrate judge finds officers did not violate Defendant's Fourth Amendment rights by entering the shared driveway at 2503 Bristol Street because they had a legitimate law enforcement objective and their entry into the driveway was limited. The Fourth Amendment protects individuals from "unreasonable searches and seizures" by the government. U.S. Const. amend. IV. "This guarantee extends not only to a residence, but also to the residence's curtilage." *United States v. White*, 928 F.3d 734, 739 (8th Cir. 2019) (citing *United States v. Bearden*, 780 F.3d 887, 893 (8th Cir. 2015)). However, "[w]here a legitimate law enforcement

9

objective exists, a warrantless entry into the curtilage is not unreasonable under the Fourth Amendment, provided that the intrusion upon one's privacy is limited." *United States v. Bennett*, 972 F.3d 966, 971 (8th Cir. 2020) (quoting *United States v. Bearden*, 780 F.3d 887, 893 (8th Cir. 2015). "Thus, 'no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways.'" *Id.* (quoting *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011)). "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is no more than any private citizen might do." *Florida v. Jardines*, 569 U.S. 1, 8 (2013). This principle is known as the "knock-and-talk" rule. *Bennett*, 972 F.3d at 971 (citing *United States v. Wells*, 648 F.3d 671, 679 (8th Cir. 2011)).

      Here, Officers Reiss and Hogan arrived at 2503 Bristol Street in relation to a shots fired 911 call. A female caller to 911 reported that she "just" saw someone shooting out of a window of a black Tahoe near North 24th Street and Bristol Street, and provided a partial license plate number for the vehicle, "YAK91." Officers found a vehicle matching that description and license plate number was registered to Defendant at 2503 Bristol Street, which is a very short distance from where the caller reported the shooting. When officers arrived at that address, they saw Defendant parking a vehicle matching the 911 caller's description in the shared driveway of the address. In reviewing the body cam footage, the driveway was not fenced or otherwise cordoned off. Defendant also indicated he lived in the unit on the other side of the driveway at 2503 Bristol, and was actually parked on his neighbor's side of the driveway at 2505 Bristol. The officers entered the common driveway and walked up to Defendant, who was standing in the driveway next to the vehicle and his neighbor's front porch. After review, the officers clearly limited their presence to an area generally accessible to visitors and were armed with a legitimate law enforcement objective, and thus their entry into the driveway to speak to Defendant did not run afoul of the Fourth Amendment. See *Bennett*, 972 F.3d at 971; *United States v. Robbins*, 682 F.3d 1111, 1116 (8th Cir. 2012) (finding officers acted in furtherance of a legitimate law enforcement objective in responding to a 911 call when officers "entered the normal access route for any visitor to the house—the driveway and an open gate to the front door").

      The undersigned magistrate judge further finds officers had reasonable suspicion to approach and detain Defendant as part of their investigation into the 911 shots fired call. The Fourth Amendment permits brief investigative stops when a law enforcement officer has "a particularized

10

and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014). Reasonable suspicion requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" a brief investigative stop. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). This standard is "less demanding" than probable cause and much lower than preponderance of the evidence. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 449 U.S. at 418). "Factors that may reasonably lead an experienced officer to investigate include time of day or night, location of the suspect parties, and the parties' behavior when they become aware of the officer's presence." *United States v. Dawdy*, 46 F.3d 1427, 1429 (8th Cir. 1995). "In addition, a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." *United States v. Quinn*, 812 F.3d 694, 698 (8th Cir. 2016). In deciding whether the requisite degree of suspicion exists, the court must view the officers' "observations as a whole, rather than as discrete and disconnected occurrences." *United States v. Hightower*, 716 F.3d 1117, 1121 (8th Cir. 2013) (quoting *United States v. Poitier*, 818 F.2d 679, 683 (8th Cir. 1987)).

Based on the totality of the circumstances, the undersigned magistrate judge finds officers had reasonable suspicion to stop and briefly detain Defendant as part of their investigation into the shots fired 911 call. As discussed above, a female caller to 911 reported that she "just" saw someone shooting out of a window of a black Tahoe near North 24th Street and Bristol Street, and provided a partial license plate number for the vehicle, "YAK91." The female caller provided her first name to the 911 dispatcher, and the dispatcher confirmed her telephone number. The specific information provided by the caller, combined with her statement she "just" saw the shooting added to the caller's reliability. See *Navarette v. California*, 572 U.S. 393, 399 (2014) ("By reporting that she had been run off the road by a specific vehicle—a silver Ford F–150 pickup, license plate 8D94925—the caller necessarily claimed eyewitness knowledge of the alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability."); *Illinois v. Gates*, 462 U.S. 213, 234

11

(1983) ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case"). Defendant stresses the fact that this appeared to be a false call or perhaps a "swatting," and emphasizes the fact that none of the officers on patrol in the general area personally heard gunfire. But, as the officers testified, they were still required to reasonably investigate the shots fired report and respond to the 911 call. Reasonable suspicion is based upon "what the officer reasonably knew at the time rather than assessing the existence of reasonable suspicion with the vision of hindsight." *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (internal quotation marks omitted) (quoting *United States v. Hollins*, 685 F.3d 703, 706 (8th Cir. 2012).

In pursuing their investigation, officers found a vehicle matching the caller's description and license plate number was registered to Defendant at 2503 Bristol Street, which is a very short distance from where the caller reported the shooting and is in an area officers characterize as a "high crime" area. Officers arrived at that address within a few minutes of the 911 call, and saw Defendant parking a vehicle matching the 911 caller's description in the driveway. See *Quinn*, 812 F.3d at 698 (finding an individual's temporal and geographic proximity to a crime scene contribute to a finding of reasonable suspicion). When officers arrived, they observed Defendant "messing around" and making "furtive" movements in the back of the Tahoe underneath the driver's seat. Defendant also acted as if he did not hear Officer Reiss and did not respond to Officer Reiss's attempt to get Defendant's attention, which further added to officers' reasonable suspicion of criminal activity. See *United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) (finding a defendant's "furtive gestures under his [vehicle's] seat as the officers approached the vehicle" added to reasonable suspicion); *United States v. Stewart*, 631 F.3d 453, 457-58 (8th Cir. 2011) (finding that defendant's presence at night in a high-crime area supported reasonable suspicion). During this time, officers also ran Defendant's criminal history, finding he was on federal probation and had a prior Nebraska charge of being a prohibited person in possession of a firearm. See *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (stating that an officer, in the course of a *Terry* stop, may ask a suspect for identification and run computer searches to determine if the driver has a criminal history or outstanding warrants).

Detective Vernon observed a firearm magazine in plain view at 7:58 p.m., approximately seven minutes after officers first made contact with Defendant in relation to the shots fired call. The

undersigned magistrate judge finds that at the time Detective Vernon observed the firearm magazine, officers still were reasonably pursuing their investigation justifying the *Terry* stop. See *United States v. Redman*, 39 F.4th 1030, 1033 (8th Cir. 2022) (quoting *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016)) ("A *Terry* stop is limited to 'the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop.'"). The act of looking through a car window is not a search for Fourth Amendment purposes because "a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car." *United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (citing *Texas v. Brown*, 460 U.S. 730, 740 (1983) ("There is no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.")). Neither probable cause nor reasonable suspicion is necessary for an officer to look through a window of a vehicle so long as he or she has a right to be in close proximity to the vehicle. See *United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999). As discussed above, officers were lawfully present in the common driveway where the Tahoe was parked, and Detective Vernon observed the firearm magazine from outside the vehicle while standing in the driveway. The magazine's incriminatory nature was immediately apparent to Detective Vernon in his training and experience. See *United States v. Craddock*, 841 F.3d 756, 759 (8th Cir. 2016) ("An item's incriminatory nature is immediately apparent if the officer at that moment had probable cause to associate the property with criminal activity.").

In sum, the undersigned magistrate judge finds officers did not violate the Fourth Amendment when they entered the common driveway to speak to Defendant as part of their investigation into the shots fired call; that officers had reasonable suspicion supporting an investigatory detention of Defendant in connection with the shots fired call; that Detective Vernon lawfully observed the firearm magazine inside the Tahoe in plain view during the course of that detention; and that the warrant affidavit established probable cause to search the Tahoe. Nevertheless, even if the officers' pre-warrant conduct did violate Defendant's Fourth Amendment rights, at a minimum, their conduct was "close enough to the line of validity" to make the officers' subsequent belief in the validity of the warrant reasonable. See *United States v. Rodriguez*, 834 F.3d 937, 941 (8th Cir. 2016) (finding the good-faith exception applied to a warrant that depended on evidence obtained as the result of an illegal search or seizure to establish probable cause because

objectively reasonable officer could have believed no prior Fourth Amendment violation occurred). Therefore, under the circumstances, the undersigned magistrate judge finds the *Leon* good faith exception would apply even if the warrant was based on evidence obtained through a Fourth Amendment violation. Accordingly, the evidence obtained from the search of Defendant's vehicle pursuant to a search warrant should not be suppressed.

Upon consideration,

**IT IS HEREBY RECOMMENDED** to Brian C. Buescher, United States District Court Judge, that Defendant's Motion to Suppress (Filing No. 23) be denied.

Dated this 7th day of August, 2023.

BY THE COURT:

s/Michael D. Nelson
United States Magistrate Judge

## ADMONITION

Pursuant to NECrimR 59.2, any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.