IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                        Plaintiff,<br><br>        vs.<br><br>JUNIAN M. JOHNSON,<br><br>                        Defendant. | **8:22-CR-270**<br><br>**MEMORANDUM AND ORDER ON OBJECTIONS TO FINDINGS AND RECOMMENDATION ON MOTION TO SUPPRESS** |

The Government has charged the Defendant, Junian M. Johnson, with one count of knowingly possessing a firearm after having been previously convicted of several felonies in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). Filing 1 at 1. On February 27, 2023, Johnson filed a Motion to Suppress in which he sought to exclude all evidence obtained by law enforcement on November 13, 2022. Filing 23 at 1. After holding an evidentiary hearing on the Motion, United States Magistrate Judge Michael D. Nelson filed a Findings and Recommendation. Filing 72 at 1. Judge Nelson recommends that Johnson's Motion to Suppress be denied. Filing 72 at 2. This matter is now before the Court on Johnson's objections to Judge Nelson's Findings and Recommendation. Filing 74. After reviewing the matter, the Court overrules Johnson's objections, adopts Judge Nelson's Findings and Recommendation in its entirety, and denies Johnson's Motion to Suppress.

## I.   BACKGROUND

Judge Nelson's Findings and Recommendation discusses the facts pertinent to Johnson's Motion in detail. *See generally* Filing 72 at 2–7. The following background information provides context for the Court's ruling on Johnson's objections.

On the evening of November 13, 2022, an individual dialed 9-1-1 and reported that she had just seen someone shooting out of a black Chevrolet Tahoe near the intersection of 24th and Bristol

Streets in Omaha, Nebraska. Filing 45 (Exhibit 2). The caller indicated that the Tahoe was travelling southbound on 24th Street and that she thought she "got" some of its license plate. According to the caller, the license plate began "YAK 91" but she did not have the last number. Filing 45 (Exhibit 2). The caller was asked to provide her first name by the 9-1-1 dispatcher, and she responded, "Jasmine." Filing 45 (Exhibit 2). The 9-1-1 dispatcher did not request the caller's last name, but he did confirm her phone number by reading it back to her. Filing 45 (Exhibit 2). When the dispatcher asked the caller whether she would like officers to speak with her, she noted that it appeared there were already officers "down there" and said she did not know what happened but "was just reporting it." Filing 45 (Exhibit 2). The 9-1-1 dispatcher told the caller that he would pass along that she did not need to be seen, requested that if she saw anything else to please call back, and terminated the phone call. Filing 45 (Exhibit 2).

Law enforcement was then advised, "CALLER SEEN BLACK TAHOE SHOOTING OFF ROUNDS, POSSIBLY JUST WENT SB ON 24TH STREET – YAK91? IS POSSIBLE PLATE." Filing 45 (Exhibit 101 at 1). At the time the 9-1-1 call came through, Omaha Police Department Officers Reiss and Hogan were on patrol near 30th and Lake—about a quarter mile away from 24th and Bristol. *See* Filing 70 at 51-52. Before Officers Reiss and Hogan responded to the call, however, a different patrol car advised that it was "about 20 feet away from 24th and Bristol" and followed up by stating "You can show that as a Code 5." Filing 70 at 51-52; Filing 45 (Exhibit 102). Officer Reiss understood this to mean that the officers in the patrol car closer to 24th and Bristol were relaying that they were "unable to locate" a black Tahoe engaged in a drive by

shooting or that it was "gone on arrival." Filing 70 at 52. There was also no indication from the city's "ShotSpotter" system that gunfire had been detected.[1]

While Officers Reiss and Hogan were responding to the area of 24th and Bristol, further information was relayed to the officers indicating that a vehicle matching the description provided by the 9-1-1 caller was registered to "2503 Bristol Street." Filing 70 at 21. The precise language provided to law enforcement was, "2503 BRISTOL HAS A BLK CHEVY TAHOE REGISTERED TO THAT ADDRES WITH LIC PLAT ENUMBER YAK 915" [sic]. Filing 45 (Exhibit 101).[2] As Officers Reiss and Hogan arrived at that area, they observed a black SUV backing into the shared driveway of that address. Filing 70 at 21. What happened next was captured on the body worn cameras of both Officers Reiss and Hogan; this footage was admitted into evidence at the suppression hearing. Filing 45 (Exhibit 4; Exhibit 5); Filing 70 at 6–7.

At the time Officers Reiss and Hogan exited their patrol car, walked toward Johnson, and began addressing him, he was standing outside on the driveway next to the rear-driver's side door of a black Chevrolet Tahoe. Filing 45 (Exhibit 4). The rear-driver's side door was initially open, and Officer Reiss told Johnson to stay out of the car. Filing 45 (Exhibit 4). Johnson did not immediately comply with this directive or respond back to the officers; he remained behind the rear driver's side door. Filing 45 (Exhibit 4). As the officers came closer, however, Johnson closed the rear driver's side door and the vehicle made a "chirping" sound as the front lights flashed.[3]

---

[1] Officer Reiss testified at the suppression hearing that the ShotSpotter system consists of physical recording devices placed around the city of Omaha and activates "when it detects a gunshot in a certain area" and provides "a certain radius range and pinpoints it." Filing 70 at 39.

[2] This message was sent at 19:49:39, a little over three minutes after the original message came through reporting, "CALLER SEEN BlACK TAHOE SHOOTING OFF ROUNDS, POSSIBLY JUST WENT SB ON 24TH STREETYAK91? IS POSSIBLE PLATE." Filing 45 (Exhibit 1).

[3] Officer Reiss explained at the suppression hearing that this indicated to him that the doors had just been locked or unlocked. Filing 70 at 26.

Filing 45 (Exhibit 4). Officer Reiss then proceeded to pat Johnson down to check for weapons despite Johnson telling him that he did not want to be patted down. Filing 45 (Exhibit 4).

Officer Reiss proceeded to ask Johnson questions about his whereabouts that night, where he lived, and what he was doing. Filing 45 (Exhibit 4). Meanwhile, Officer Hogan began looking through the windows of the Tahoe. Filing 45 (Exhibit 5). Johnson explained to Officer Reiss that he lived at 2503 Bristol Street, but that he parked on the side of the shared driveway abutting his neighbor at 2505 Bristol Steet. Filing 45 (Exhibit 4). Around this time, Sergeant Petrick and Detective Vernon arrived at the scene. Filing 45 (Exhibit 109). Officer Reiss asked Johnson if he "had an ID on him" and Johnson ultimately provided it to Officer Reiss. Filing 45 (Exhibit 109). Before doing so, however, Johnson said, "You know what. My girlfriend just did this, didn't she?" Filing 45 (Exhibit 109). Johnson then called someone on his cell phone in the presence of the officers. Filing 45 (Exhibit 109). While Johnson was on the phone, officers continued looking through the windows of the Tahoe. Filing 45 (Exhibit 109).

Detective Vernon completed a second pat down of Johnson and then placed him in handcuffs while Officer Reiss took Johnson's identification. Filing 45 (Exhibit 4; Exhibit 5). As Detective Vernon handcuffed Johnson, Sergeant Petrick explained to Johnson that somebody had called and reported that he "was involved in firing shots in this vehicle" and that they wanted to check and make sure there was not a weapon in the vehicle. Filing 45 (Exhibit 109). Meanwhile, Officer Reiss returned to his cruiser with Johnson's identification and began to run a data check. Filing 45 (Exhibit 4; Exhibit 5). Approximately four minutes after Johnson was first handcuffed, Detective Vernon looked through the rear driver's side window of the Tahoe and said, "Looks like you got a gun in there." Filing 45 (Exhibit 3; Exhibit 5). Detective Vernon then said that he could see a magazine in the Tahoe and directed Officer Hogan to place Johnson in the back of a squad

4

car. Filing 45 (Exhibit 3; Exhibit 5). From the time officers arrived at the scene to the time that Detective Vernon observed the firearm, less than eight minutes elapsed. *See* Filing 45 (Exhibit 5).

After noticing the firearm magazine in Johnson's Tahoe, Detective Vernon briefly spoke with Officer Blandford who had just arrived on the scene moments before. Filing 45 (Exhibit 3; Exhibit 106; Exhibit 107).[4] Officers Blandford and his partner Officer Hetherington happened to be the same officers who initially reported to dispatch that they were near the area of 24th and Bristol but did not hear any shots fired. Filing 70 at 178. When Officer Blandford spoke with Detective Vernon, he noted that he and Officer Harrington had not heard any shots despite being near 24th and Bristol at the time. Filing 70 at 186; Filing 45 (Exhibit 3). Officer Blandford also expressed that based on his understanding of a prior "back and forth" between Johnson and another individual, he had reason to believe that the 9-1-1 call may have been inaccurate and that someone "might have made [the] call knowing that [Johnson] had a gun to get him in trouble[.]" Filing 70 at 190–91. However, by the time Officer Blandford relayed this information to Detective Vernon, Detective Vernon had already seen the magazine in the Tahoe. Filing 45 (Exhibit 3).[5]

Detective Vernon then began asking other officers whether Johnson was a felon. Filing 45 (Exhibit 3). Officer Reiss initially advised Detective Vernon that Johnson was not a felon, but "was on U.S. probation" at some point prior. Filing 45 (Exhibit 3). However, Sergeant Petrick later asked Johnson directly whether he was a felon and Johnson responded in the affirmative. Filing

---

[4] Officer Blandford and his partner, Officer Hetherington, did not arrive at the scene until after Johnson had already been placed in handcuffs. Filing 45 (Exhibit 106). In fact, Officer Blandford did not even begin approaching Detective Vernon until the moment right before Detective Vernon observed the magazine in the Tahoe. Filing 45 (Exhibit 106). Officers Blandford and Hetherington remained on the scene for less than three minutes in total before leaving. Filing 45 (Exhibit 106).

[5] While Officer Blandford spoke with Detective Vernon, Officer Hetherington told Sergeant Petrick that he and Officer Blandford were near the area where the shots were reported to have occurred but did not hear anything. Filing 45 (Exhibit 106).

45 (Exhibit 109). When asked whether his felony conviction was "federal" Johnson also responded in the affirmative. Filing 45 (Exhibit 109). Sergeant Petrick relayed this information to his fellow officers. Filing 45 (Exhibit 109).[6]

While the officers initially attempted to secure the firearm by opening the Tahoe, they could not do so because the doors were locked and the keys were inside. Filing 45 (Exhibit 3). The decision was ultimately made to have the Tahoe towed to an impound lot while a search warrant was drawn up. Filing 45 (Exhibit 109). Detective Vernon applied for a search warrant and completed an affidavit in support of its issuance. Filing 45 (Exhibit 1). The affidavit included the following information:

> On SUNDAY 13 NOVEMBER 2022 at approx. 1946 hours UPB Officers Tanner REISS #2523 and August HOGAN #2263 were dispatched to the area of 2500 Bristol regarding a shot fired call. Dispatch reported the caller saw a "black Tahoe shooting off rounds ... possibly Just went west on N 24th … Plate YAK91?"
>
> Your affiant completed a data check on possible license plates starting with YAK91. Your affiant found a possible matching license plate YAK915 belonging to a Black 2011 Chevrolet Tahoe K1500 registered to Junian Marsa'illes JOHNSON at 2503 Bristol Street, Omaha Ne. 68111. Your affiant notified responding officers of the possible address via police radio.
>
> Officers REISS and HOGAN observed the vehicle on Bristol Street backing Into a driveway at 2505 Bristol Street. Officers REISS and HOGAN both reported observing the vehicle initially on Bristol, a city street in Omaha Ne.
>
> Officers REISS and HOGAN informed affiant officer they both approached the vehicle and observed the driver later Identified as Junian M. JOHNSON (b/m 5-3-76) standing outside the rear driver's side door. Officers REISS and HOGAN described JOHNSON "messing around" inside the vehicle behind the driver's seat. Officers then said JOHNSON closed the door.
>
> Your affiant and Sgt. Zackary PETRICK #1655 arrived to assist. Your affiant asked JOHNSON for consent to search his vehicle. JOHNSON denied consent to

---

[6] Upon hearing this, Officer Reiss said that would explain why his search of the Nebraska Criminal Justice Information System (NCJIS) did not reveal a felony conviction. Filing 45 (Exhibit 4; Exhibit 109). Officer Reiss explained during his testimony at the suppression hearing that NCJIS is "limited specifically to the state of Nebraska" and he would have to rely on "more involved" systems that require coordination with the dispatch center in order to determine if an individual has been convicted in another state or in the federal system. Filing 70 at 169.

search and said there were no drugs or weapons in the vehicle. JOHNSON further stated he did not own the vehicle.

Your affiant then used a flashlight and looked inside the vehicle. Your affiant looked in the driver's side back door window. Your affiant observed what appeared to be the bottom one inch of a handgun magazine.

Officer HOGAN #2263 completed a data check on JOHNSON finding he Is a convicted felon as of 06/30/98 for a charge of Felon in Possession of a Firearm out of Illinois as well as 08/10/07 for a Federal Conviction of Felon In Possession of a Weapon.

Vehicle #1- Black Chevy Tahoe NE/ YAK915 was towed to the police impound lot 7809 "F" St. and is currently being held pending this search warrant request.

Your affiant believes that if he is granted this court authorized search warrant he would find evidence related to the shots fired/ Felon In Possession of a Firearm.

Filing 45 (Exhibit 1).

A Nebraska county court judge signed a search warrant for the Tahoe after being presented with this information. Filing 45 (Exhibit 1). Detective Vernon and Sergeant Petrick executed the search warrant at the impound lot and located a firearm attached to the magazine that Detective Vernon initially saw through the window of the Tahoe. Filing 45 (Exhibit 110; Exhibit 111). The officers also uncovered pills that were later determined to be fentanyl. Filing 45 (Exhibit 110; Exhibit 111).

## II.   ANALYSIS

### A.  Standard of Review

Under 28 U.S.C. § 636(b)(1), different standards of review apply when a party objects to a pretrial decision or a proposed findings of fact and recommendations by a magistrate judge. *See* 28 U.S.C. § 636(b)(1). When a party objects to a magistrate judge's proposed findings and recommendations, "[a] judge of the court shall make a de novo determination of those portions . . . to which objection is made." *Id.*; *accord Gonzales-Perez v. Harper*, 241 F.3d 633, 636 (8th Cir. 2001) (When a party timely objects to a magistrate judge's report and recommendation, the district

court is required to make a de novo review of the record related to the objections . . . ."). The reviewing district court judge is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). If desired, a reviewing district court judge may "receive further evidence or recommit the matter to the magistrate judge with instructions." *Id.*

Under *de novo* review, a reviewing court "makes its own determinations of disputed issues and does not decide whether the magistrate[] [judge's] proposed findings are clearly erroneous." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). *De novo* review is non-deferential and requires an independent review of the entire matter. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991) ("When de novo review is compelled, no form of appellate deference is acceptable."); *United States v. Backer*, 362 F.3d 504, 508 (8th Cir. 2004) ("'De novo' is a Latin term literally meaning 'as new.' Our review is independent and not premised on the district court's appropriate use of its discretion. We are concerned only with the proper application of the law . . . ."). When a party contests a magistrate judge's findings that resulted from an evidentiary hearing, the reviewing district court judge does not need to conduct another hearing. *See United States v. Raddatz*, 447 U.S. 667, 674 (1980) (holding that 28 U.S.C. § 636 "calls for a de novo determination, not a de novo hearing"). Instead, the district court discharges its duty by, at a minimum, listening to a tape recording or reading a transcript of the evidentiary hearing. *See United States v. Azure*, 539 F.3d 904, 910–11 (8th Cir. 2008). Here, the undersigned has read the transcript of the suppression hearing and has reviewed the exhibits admitted at the hearing.

### B. Johnson's Objections

Johnson raises five objections to Judge Nelson's Findings and Recommendation. Filing 74 at 1. Specifically, he claims that Judge Nelson (1) erred in finding that officers had reasonable suspicion to detain Johnson, (2) erred in finding that the investigatory detention "was not

minimally intrusive;" (3) erred in finding that the officers were lawfully on the shared driveway when they observed a magazine inside Johnson's vehicle; (4) erred in finding that the warrant was supported by probable cause and did not contain material omissions or false statements with reckless disregard for the truth; and (5) erred in finding that the good faith exception applies. Filing 74 at 1; Filing 75 at 5, 18, 20–22. The Court will address each of these objections in turn.

1. *Objection 1: The Existence of Reasonable Suspicion*

Johnson's first argument is that Judge Nelson "erred in finding that officers had reasonable suspicion justifying an investigatory stop and detention of Defendant." Filing 75 at 5. Of the five objections he raises, Johnson devotes the bulk of his briefing to this issue. *See* Filing 75 at 5–18. Johnson primarily argues that while Judge Nelson considered the facts tending to support reasonable suspicion, he failed to properly consider other facts that suggested a lack of reasonable suspicion. *See* Filing 75 at 5–6. He posits that when appropriate consideration is given to these other factors, "the totality of the circumstances known to responding officers was not sufficient to give rise to reasonable suspicion." Filing 75 at 18. However, upon *de novo* review, the Court agrees with Judge Nelson's conclusion that there was reasonable suspicion to detain Johnson in connection with the shots fired call. *See* Filing 72 at 13

Johnson does not dispute that his Tahoe matched the description of the vehicle that was relayed to the 9-1-1 dispatcher—right down to the license plate. Indeed, he admits in his brief that the 9-1-1 caller relayed an "accurate physical description" of Johnson's vehicle. Filing 75 at 8. Nor does Johnson dispute that he and his Tahoe were found close to the location where the 9-1-1 caller purportedly observed the shots being fired, that officers were advised a black Tahoe with a matching license plate was registered to an address at that location, and that officers observed him driving his car into the driveway at that address immediately before approaching him. Nonetheless,

9

Johnson argues that the officers should have discounted these facts in their reasonable suspicion analysis because other facts tended to cast doubt on the 9-1-1 caller's shots fired report. *See generally* Filing 75 at 5–18. He primarily focuses on the fact that the ShotSpotter system did not detect gunfire and Officers Heatherington and Blandford were in the area where the shots were supposedly being fired yet neither heard any shots and reported that they did not see a black Tahoe in the area. Johnson therefore contends that these considerations made the "largely anonymous" 9-1-1 caller's report an insufficiently reliable basis upon which to ground reasonable suspicion. *See generally* Filing 75 at 5–18.

The Court disagrees. "Because the determination as to reasonable suspicion must be based on the 'totality of the circumstances,' courts may not view individual elements of suspicion in isolation. In fact, *'Terry* . . . precludes this sort-of divide-and-conquer analysis.'" *United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020) (internal citations omitted) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)). Johnson effectively asks this Court to engage in the type of "divide-and conquer" analysis the Supreme Court has expressly repudiated. *Arvizu*, 534 U.S. at 274. Under the totality of the circumstances, which includes the serious, contemporaneous, and very descriptive nature of the 9-1-1 call, the Court finds that the responding officers had reasonable suspicion to detain Johnson.

As for Johnson's suggestion that the 9-1-1 caller's report lacked reliability due to her degree of anonymity, there is no evidence that she sought to conceal her identity. While Johnson argues that the caller "was largely anonymous" because "she gave a first name, confirmed her phone number, but gave no address," the Court notes that after listening to the 9-1-1 call, she was never asked to provide her address; nor was she asked to provide her last name either. *See* Filing 45 (Exhibit 2) The dispatcher only asked for her first name—which she then spelled out for him.

Given that she confirmed her first name and phone number to the dispatcher, the Court is not persuaded by Johnson's argument that she was unreliable because she "was largely anonymous."

In any event, the Supreme Court has recognized "that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990). In *Navarette v. California*, for example, the Supreme Court concluded that an individual who called 9-1-1 and reported the specific make, model, and license plate of a vehicle while claiming eyewitness knowledge, demonstrated a "basis of knowledge lend[ing] significant support to the tip's reliability." 572 U.S. 393, 399 (2014). That is what we have here. The 9-1-1 caller in this case likewise reported having just seen an individual in a black Tahoe fire a weapon in a particular location and she was also able to provide a partial license plate number. Moreover, the fact that she claimed to have "just seen" this occur lent further credibility to her report given its contemporaneous nature. *See id.* at 399-400. Finally, the fact that the caller made the report by calling 9-1-1 and even confirmed her phone number also lent credibility to her report because, as the Supreme Court recognized in *Navarette*, "911 calls can be recorded, which provides victims with an opportunity to identify the false tipster's voice and subject him to prosecution[.]" *Id.* at 400. Each of these factors lent a sufficient degree of credibility to the 9-1-1 call, thereby allowing the responding officers to reasonably rely upon it in determining they had reasonable suspicion to detain Johnson.

Despite this, Johnson insists that the 9-1-1 call was a false report. Whether that actually was the case is not determinative of the issue. In deciding whether officers had reasonable suspicion, courts consider what they "reasonably knew at the time rather than assessing the existence of reasonable suspicion with the vision of hindsight." *United States v. Slater*, 979 F.3d 626, 629 (8th Cir. 2020) (internal quotation marks and citation omitted). At the end of the day, the

officers were responding to a "shots fired" call. Officer Reiss made clear during his testimony that "[a] 911 call about a drive-by shooting would be a very serious call[.]" Filing 70 at 43. The Court agrees this was, indeed, a serious allegation that necessitated a prompt response. When Officer Hetherington testified at the suppression hearing, Johnson's counsel asked him whether the fact he did not hear shots led him "to believe that the 911 call might have contained false information[.]" Filing 70 at 180. Officer Hetherington responded, "Not necessarily. It could have been possibly something we missed, but we still have to respond to the call for service[.]" Filing 70 at 180. The Court is not persuaded by the suggestion that officers should not have investigated the shots fired incident because they did not personally hear the gunfire and the ShotSpotter technology did not activate.

While one could argue that the facts Johnson cites might have allowed law enforcement to speculate it was more likely than not that the report was inaccurate after having the opportunity to carefully deliberate on the matter and collectively consider the facts known to each individual officer with the benefit of hindsight like a jury might do, that is not the framework this Court applies in a reasonable suspicion analysis. *See Slater*, 979 F.3d at 629. Under the totality of the circumstances, alternative, piecemeal facts suggesting that the 9-1-1 call might have been inaccurate did not vitiate the responding officer's reasonable suspicion justifying Johnson's detention. This is especially true given the surrounding facts which substantiated the 9-1-1 caller's report, including the description of the vehicle, the matching license plate, the proximity to where the reported crime was alleged to have occurred, and the fact that officers observed Johnson driving his vehicle when they first pulled up (*i.e.*, he was observed driving his Tahoe not long after the shots fired call came in). Moreover, the officer's reasonable suspicion would only have been strengthened when they approached Johnson and he did not immediately respond to them and

continued "messing around" in the back seat of his vehicle even when they told him to stop. *See* Filing 70 at 27; Filing 45 (Exhibit 3); *United States v. Morgan*, 729 F.3d 1086, 1090 (8th Cir. 2013) (noting that a suspect's "furtive gestures under his seat as the officers approach the vehicle gave them reason to believe that there was a weapon in the vehicle"). For the foregoing reasons, the responding officers had reasonable suspicion to detain Johnson in connection with the shots fired investigation and this objection is without merit.

2. *Objection 2: The Invasiveness and Duration of the Investigatory Detention*

Johnson's second argument is that Judge Nelson "erred in finding that the investigatory detention was not minimally intrusive." Filing 75 at 18; *see also* Filing 74 at 1. Although the phrasing of this objection is somewhat confusing, the Court understands Johnson to be contesting the reasonableness of his detention based upon its duration and scope. *See* Filing 75 at 20 (Johnson arguing his detention ran afoul of the Fourth Amendment because "[u]nder the circumstances, the seven minutes between when [he] was first detained and when officers observed the magazine underlying their claim of probable cause to arrest [him] and search his vehicle was longer than necessary"). Upon *de novo* review, the Court agrees with Judge Nelson's conclusion that during the seven or so minutes that elapsed between when officers first arrived at the scene and when Detective Version noticed the firearm magazine, Johnson's detention was neither longer nor more intrusive than reasonably necessary. *See* Filing 72 at 12–13.

As an initial matter, Johnson correctly admits that "the time that passed in and of itself was not particularly long[.]" Filing 75 at 20. However, he contends that in these seven or so minutes officers did not engage in "a good-faith, diligent investigation . . . with the goal of corroborating the 911 caller's shots fired claim." Filing 17 at 19. The Court disagrees. The 911 caller reported that an individual was shooting out of a black Tahoe. It therefore only made sense that the officers

would survey areas in their plain view to see whether there was evidence to substantiate their reasonable suspicion. The point of an investigatory detention is to allow an officer "to make reasonable inquiries when the officer 'has reasonable suspicion that criminal activity may be afoot.'" *United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (citation omitted). Here, the officers had a legitimate law enforcement objective (*i.e.*, investigating the shots fired call involving a vehicle description matching Johnson's Tahoe) and their intrusion on Johnson's privacy interests was minimal. *See United States v. Bennett*, 972 F.3d 966, 972 (8th Cir. 2020). Just as in *Bennett*, "any intrusion on [Johnson's] privacy interests was minimal because [Johnson] placed himself in a visible location and officers saw him from the street." *Id.* at 972.

It stands to reason that officers would peer through the windows of Johnson's black Tahoe given that they were responding to a 9-1-1 call alleging serious illegal activity occurring within a black Tahoe. *See United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995) (noting that an officer did not violate the Fourth Amendment when he looked through the defendant's car window "because a person who parks a car—which necessarily has transparent windows—on private property does not have a reasonable expectation of privacy in the visible interior of his car"); *accord United States v. Sanchez*, 955 F.3d 669, 677 (8th Cir. 2020). It does not matter whether Johnson's windows were tinted or that the officers used their flashlights to peer inside his Tahoe. *Hatten*, 68 F.3d at 261. Moreover, "[n]either probable cause nor reasonable suspicion is necessary for an officer to look through a window (or open door) of a vehicle so long as he or she has a right to be in close proximity to the vehicle." *United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007). The officers in this case had a right to be in close proximity to the vehicle particularly given that Johnson was in close proximity to the vehicle when they approached him. Indeed, officers watched Johnson back the Tahoe into the driveway and then exit it at the time they made initial

14

contact with him. The body camera footage also plainly shows Johnson initially had his rear, driver's side passenger door open, but he closed it as officers approached and began addressing him. Filing 45 (Exhibit 4).

The Court is also not persuaded by Johnson's argument that "[a]t any time after receiving the call from dispatch, responding officers could have contacted Officers Heatherington [sic] and Blandford a half-block away, [but] they made no effort to do so, despite being well aware of their presence." Filing 75 at 19. As the Court previously noted, Officers Hetherington and Blandford did arrive at the scene and spoke with the other officers, but by the time Officer Blandford spoke with Detective Vernon, Detective Vernon had already observed the firearm magazine in the Tahoe. Accordingly, Johnson's detention was neither impermissible in scope nor duration and this objection lacks merit.

### 3. Objection 3: Law Enforcement's Presence on the Shared Driveway

Johnson's third argument is that Judge Nelson "erred in finding that the officers were lawfully on the shared driveway when they observed a magazine inside Defendant's vehicle." Filing 75 at 20. However, Johnson concedes that "[i]f the responding officers had reasonable suspicion to conduct a *Terry* stop of [him], then it follows that they were lawfully present on the shared driveway when they observed the magazine inside his vehicle." Filing 75 at 20. Thus, this objection is mooted by the Court's determination that the responding officers did have reasonable suspicion to detain Johnson, and, therefore, were lawfully present on the driveway when they observed the magazine in the Tahoe. The Court overrules this objection on that basis.

### 4. Objection 4: Probable Cause to Support the Warrant

Johnson's fourth argument is that Judge Nelson "erred in finding that the warrant was supported by probable cause and did not contain material omissions or false statements with

reckless disregard for the truth." Filing 75 at 21. Pursuant to the Supreme Court's decision in *Franks v. Delaware*, 438 U.S. 154 (1978), "a criminal defendant may request a hearing to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013); *see also United States v. Juneau*, 73 F.4th 607, 615 n.5 (8th Cir. 2023) (favorably citing *Arnold*). Such a hearing is commonly referred to as a "*Franks* hearing." *See e.g.*, *Juneau*, 73 F.4th at 615 n.5. "However, in order to merit a *Franks* hearing, [the defendant] must show both (1) that the affiant . . . 'knowingly and intentionally' made false statements or made them in 'reckless disregard for the truth' and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *Arnold*, 725 F.3d at 898. As the Eighth Circuit has explained, this "requirement of a substantial preliminary showing is not lightly met[.]" *Id.* (citation omitted).

During the suppression hearing, Judge Nelson noted on the record that it was "not really necessarily clear to [him] in the briefing, but there [was] some intimation that there is a *Franks* issue in this case." Filing 70 at 12. After hearing from the parties, Judge Nelson stated upon review of the search warrant itself, the affidavit and application for issuance of the search warrant, the parties' submissions, and the exhibits that were provided in advance of the hearing, Johnson "failed to make a substantial preliminary showing . . . that there was an intentional or reckless false statement or omission necessary to the finding of probable cause." Filing 70 at 15–16. Judge Nelson then stated, "to the extent that the defendant is requesting a *Franks* hearing today, that will be denied." Filing 70 at 16; *see also* Filing 72 at 7 n.2. At no point during the suppression hearing did Judge Nelson revisit this ruling or otherwise revise it. *See generally* Filing 70. However, in his written "Closing Argument in Support of Motion to Supress" [sic], Filing 71, Johnson

16

"reiterate[d] his request and arguments in favor of a Frank's [sic] hearing which [the magistrate judge] denied at the onset of the evidentiary hearing on this matter in order to preserve his rights on appeal." Filing 71 at 4.

Johnson's objection misses the mark. He contends that the probable cause affidavit should have included information from Officers Heatherington and Blandford suggesting that they did not hear any shots fired or observe a Tahoe despite their proximity to the location and that the 9-1-1 call "may have been retaliation for a neighborhood dispute between a confidential [informant] and [Johnson]." Filing 75 at 21. He also suggests that the affidavit should have included the lack of ShotSpotter activation. Filing 75 at 22. In Johnson's view, this information "was material to the question of probable cause and the officers omitted it from the search warrant affidavit in order to mislead the issuing judge." Filing 75 at 22.

Upon *de novo* review, the Court agrees with Judge Nelson's conclusion that Johnson failed to establish a substantial preliminary showing meriting a *Franks* hearing. *See* Filing 70 at 16; Filing 72 at 7 n.2. Even if all the information that Johnson says was improperly omitted from the affidavit had been included, this would not have vitiated probable cause—certainly not for the felon in possession charge that the officers advised the judge they were investigating. *See* Filing 45 (Exhibit 1 at 2). Furthermore, Detective Vernon's body camera shows that he saw the magazine in plain view (and vocalized that he saw it) before Officer Blandford suggested that the shots fired call could have potentially been a false report. That is, the false report hypothesis was not made known to Detective Vernon until he already came across evidence relating to the Felon in Possession of a Firearm Offense that ultimately served as one of the bases for the search warrant.

The affidavit completed by Detective Vernon stated that after looking inside of the vehicle, he "observed what appeared to be the bottom one inch of a handgun magazine." Filing 45 (Exhibit

17

1 at 2). The affidavit went on to state that when Officer Hogan completed a data check on Johnson, it revealed that Johnson "is a convicted felon as of 06/30/98 for a charge of Felon in Possession of a Firearm out of Illinois as well as 08/10/07 for a Federal Conviction of Felon in Possession of a Weapon." Filing 45 (Exhibit 1 at 2). Detective Vernon completed his affidavit by expressing his belief that if the court were to authorize a search of Johnson's Tahoe, "he would find evidence related to the shots fired/Felon in Possession of a Firearm." Filing 45 (Exhibit 1 at 2). From a probable cause to search the vehicle perspective, it makes no difference whether the ShotSpotter activated or whether other officers heard shots, saw the Tahoe, or questioned the motives of the 9-1-1 caller. None of this has any bearing on the fact that Detective Vernon saw the magazine in plain view and then confirmed that Johnson was prohibited from possessing a firearm based on his criminal history. It bears repeating that in order to merit a *Franks* hearing the "requirement of a substantial preliminary showing is not lightly met[,]" *Arnold*, 725 F.3d at 898, and Judge Nelson was correct to find that Johnson failed to satisfy his initial burden in this case. In sum, and upon *de novo* review, the Court agrees with Judge Nelson's conclusion that the affidavit in support of the warrant "established probable cause to issue the search warrant for the Tahoe, and that none of the information supporting probable cause was obtained in violation of Defendant's Fourth Amendment rights." Filing 72 at 9. Accordingly, Johnson's objection is overruled.

    5. *Objection 5: The Good Faith Exception*

    Johnson's fifth and final argument is that Judge Nelson "erred in finding that the *Leon* good faith exception applies." Filing 75 at 22. In *United States v. Leon*, 468 U.S. 897 (1984), the Supreme Court recognized an exception to the exclusionary rule that applies "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope, even if the warrant is subsequently invalidated." *United States v. Long*, 797 F.3d

18

558, 566 (8th Cir. 2015) (cleaned up). Under this exception, "disputed evidence will be admitted if it was objectively reasonable for the officer executing a search warrant to have relied in good faith on the judge's determination that there was probable cause to issue the warrant." *United States v. Lindsey*, 43 F.4th 843, 848 (8th Cir. 2022) (internal quotations and citation omitted). Courts consider the totality of the circumstances in determining "whether an officer had 'an objectively reasonable belief in the existence of probable cause,'" which includes "information known to the officer but not presented to the issuing judge." *Id.* (internal quotations and citation omitted). Ultimately, this "'inquiry is confined to the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization.'" *Id.* (quoting *United States v. Williams*, 976 F.3d 807, 809 (8th Cir. 2020)).

Johnson contends that "responding officers omitted from [the] search warrant very important information that a reasonable officer would have known was relevant to the probable cause determination." Filing 75 at 23. In his view, "[t]he responding officers' actions, taken as a whole, indicate that they believed the facts known to them were insufficient to support reasonable suspicion to detain Defendant or probable cause to search Defendant's vehicle." Filing 75 at 24. Because Johnson believes that "the responding officers acted in bad faith" he contends that "the *Leon* exception should not apply." Filing 75 at 24. This objection is mooted by the Court's conclusion that the warrant was supported by probable cause and did not contain factual misrepresentations or omissions relevant to this determination. Nevertheless, even if the Court were to assume solely for the sake of argument that probable cause was lacking, the Court would still overrule Johnson's objection because the good-faith exception to the exclusionary rule applies.

Johnson attempts to ascribe "deceptive intent on the part of responding officers" by citing statements that were made in the arrest warrant in this case. Filing 75 at 23. Even if there were

19

inaccuracies in the arrest affidavit, this is immaterial for two reasons. First, what matters here is the *search* warrant—not the *arrest* affidavit, and even Johnson concedes that the statements he claims to be inaccurate "did not appear in the Affidavit for a Search Warrant[.]" Filing 75 at 23. Second, the arrest affidavit was completed by Officer Reiss. Filing 45 (Defense Exhibit 104). The affidavit in support of the search warrant was completed by Detective Vernon. Filing 45 (Exhibit 1 at 2). Detective Vernon and Sergeant Petrick ultimately searched Johnson's vehicle after obtaining a warrant; Officer Reiss was not involved in the search of the vehicle. Filing 45 (Exhibit 110; Exhibit 111). Accordingly, even if the Court were to assume *arguendo* that Officer Reiss evinced a deceptive intent when he completed his arrest affidavit, there is nothing to indicate that it spilled over into the affidavit in support probable cause that was completed by Detective Vernon. Indeed, Officer Reiss neither applied for, attested on behalf of, obtained, or executed the search warrant. Those functions were performed by Detective Vernon and Sergeant Petrick. Accordingly, while the Court is not convinced that any of the evidence Johnson cites to evinces "a deceptive intent," he most certainly has not pointed to any evidence relating to Detective Vernon and Sergeant Petrick—the officers who were actually involved in obtaining a search warrant and effectuating it.[7] Upon *de novo* review, the Court finds "that it was objectively reasonable for law enforcement officers to rely on the search warrant[] and, accordingly, the *Leon* good-faith exception applies." *United States v. Lindsey*, 43 F.4th 843, 849 (8th Cir. 2022).

### III.    CONCLUSION

The Court agrees with the findings and conclusions reached by Judge Nelson. Accordingly,

---

[7]Johnson also cites to a conversation Officers Hogan and Reiss had after the magazine was discovered in Johnson's vehicle. *See* Filing 75 at 23. Here again, Officers Hogan and Reiss were not involved in obtaining or executing the search warrant, apart from the fact that Officer Hogan ran a records check on Johnson that revealed he was a convicted felon.

IT IS ORDERED:

1. Johnson's Objections to the Magistrate Judge's Findings and Recommendation at Filing 74 are overruled;

2. The Magistrate Judge's Findings and Recommendation, Filing 72, is adopted in its entirety; and

3. Johnson's Motion to Suppress, Filing 23, is denied.

Dated this 15th day of September, 2023.

BY THE COURT:

Brian C. Buescher
United States District Judge